Filed 10/3/16  P. v. Turrey CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JIMMY TURREY,<br><br>    Defendant and Appellant. | G050708<br><br>(Super. Ct. No. 13CF1438)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed.

Jan B. Norman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Jimmy Turrey of possession of ammunition by a prohibited person (Pen. Code, § 30305, subd. (a)(1)),[1] possession of methamphetamine for sale (Health & Saf. Code, § 11378), and possession of controlled substance paraphernalia (Health & Saf. Code, § 11364.1, subd. (a)), and found true he possessed the ammunition and methamphetamine for sale for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  The court found defendant had suffered prior strike convictions and served prior prison terms.  After exercising its discretion under section 1385 to dismiss one prior strike, and striking for purposes of sentencing two prior prison terms, it sentenced him to a prison term of 13 years.

On appeal defendant contends insufficient evidence showed he had possession, custody, or control of the ammunition or the methamphetamine.  We disagree and affirm the judgment.

FACTS

On the morning of March 1, 2013, a police officer detained defendant in the City of Orange for riding a bicycle against traffic and without a registration sticker, which the City of Orange requires.  The officer found three empty Ziploc baggies, about one-inch by one-inch in size, in defendant's front pants pocket.  Such baggies are also called "bindles" and can be used to package drugs.

Two months later, in the late morning of April 30, 2013, uniformed police officers (at least some of whom were assigned to the gang unit), along with a probation officer, went to a house in the City of Orange to try to locate and contact defendant.  The house sat behind another residence and had two driveways.  Its patio was enclosed by a very tall fence and its front gate was padlocked.

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

2

Two officers went to the front gate and tried to open it. A woman (later identified as Ona Matlock) came to the house's security screen and asked if she could help them. Only the taller officer could see her over the fence. The officers said they needed to talk with her. She said she needed to get the key to the gate. At least two to three minutes passed before she came out and unlocked the gate. As she spoke with the officers, she seemed very nervous.

The officers walked with her toward the front door and summoned the other occupants to come out. Matlock's four children and David Tinder[2] (the father of two of Matlock's children) came outside.

The officers called for defendant, who came out of the middle bedroom into the hallway.

In the middle bedroom, the officers found two television monitors broadcasting live video feed from two video cameras that captured different areas in front of the house, e.g., both driveways, the front gate, part of the fence, and the area in front of the house.

Also in the middle bedroom, in a bottom drawer of a dresser, the officers found methamphetamine in three receptacles (a pill canister, a plastic tube, and a plastic wrapping), as well as a lighter. The total weight of the methamphetamine was almost nine grams.

In a shed in the back yard, an officer found a partially opened black bag that contained male clothing (boxers, t-shirts, and jeans), as well as two documents bearing defendant's name and a third document bearing the name and booking number of another member of the Varrio Modena Locos gang (VML). A burgundy bag found in the shed contained five rounds of nine-millimeter luger ammunition, as well as male clothing

---

[2] For convenience and to avoid confusion we refer to David Tinder by his last name, but refer to his son, Ryan Tinder, by his first name.

and a methamphetamine pipe. After the officer finished searching the shed, he spoke to Matlock, who said that defendant "spends all day in there."

Matlock gave the officers a cell phone belonging to defendant. Its contents included (1) five photos of defendant inside or just outside the shed taken between mid- to late February 2013, (2) two video screen shots and two photos of defendant inside the middle bedroom taken between mid- to late February 2013, (3) two photos of defendant inside the shed in late April 2013, and (4) a photo of the live surveillance feed in the middle bedroom in late April 2013. Because the phone was locked, the police were unable to retrieve text messages or a call log.

The parties stipulated that defendant is legally prohibited from possessing ammunition and had been convicted on September 21, 2001 of illegally possessing methamphetamine. They further stipulated that VML is a criminal street gang.

*Matlock's Trial Testimony*

Matlock testified that defendant was "visiting" and, when he stayed with them, he slept in the middle bedroom, which was Tinder's room. The middle bedroom door had a lock to which Tinder had the key.

The front gate had been locked because Tinder, who was jealous and controlling, "liked to lock [Matlock] in." Matlock had a restraining order against Tinder, but had allowed him back in the home about a year ago to give him a chance to reconcile with her and to let him see the children. She had seen Tinder using drugs during that year. Tinder was not working during this time period.

Defendant was Matlock's fiancé. Defendant "had been in the house on and off for a period of time," including at least the two weeks leading up to April 30, 2013. Defendant spent his time in the middle bedroom or the shed.

Matlock said she rarely spent any time in the shed which was about 10 feet long and contained Christmas and sports items. Tinder had torn down the original shed

4

and rebuilt it in January 2013.  Defendant was "pretty much . . . out there all day."
Tinder also spent a lot of time there.  Neighbors "came and always helped [defendant and Tinder] work on building the shed."  Tinder had the key to the lock on the shed's only door.  Matlock did not think there were any bullets in the shed because she and her children did not own a gun, nor did Tinder own a gun as far as she knew.  The pipe for smoking drugs did not belong to her or her children.

*Ryan's Trial Testimony*

Ryan was 18 years old when he testified at defendant's trial.

Defendant began showing up at their house around January or February of 2013.  He spent the night there "quite often."  Defendant and Tinder stayed in the middle bedroom.  Ryan's three-year-old stepsister sometimes stayed there too.  There was no bed in the room, so defendant and Tinder slept on the floor.  But there was a safe in the room. Tinder kept his clothes in the room's closet, *not* in the shed.

During the time period when defendant was at the house, Ryan and his siblings did not go in the shed.  Matlock would go in and out of the shed a lot.  Defendant and Tinder would be there for an hour at a time.

The large black bag containing clothes in the shed belonged to defendant.

Ryan had never seen Tinder with a gun or ammunition.  After Tinder was released from jail around July of 2013, he told Ryan he had been selling drugs in the house.

The lock on the front gate could be taken on and off, so Ryan, his siblings, and Matlock were able to come and go as they pleased.  The door to the middle bedroom was locked late at night, when Tinder and defendant would typically be inside.

5

*Experts' Trial Testimony*

A gang and narcotics expert opined that, hypothetically, if a drawer in a house held a plastic container of 3.2 grams of methamphetamine, a plastic vial containing 2 grams, and a tied off plastic bindle containing 3.7 grams, the methamphetamine would be possessed for sale. This opinion would be reinforced if an associated individual had been found in possession of one-inch by one-inch Ziploc baggies 45 to 60 days before, since those baggies are commonly used by drug dealers. Surveillance equipment is another indicator of narcotics sales. The street value of the methamphetamine was between $800 to $1,600, depending on whether it was sold in grams or tenths of grams. One of the primary activities of gangs in the City of Orange is narcotics sales.

Another gang expert testified that gangs keep guns and ammunition in their homes and cars, and share guns and ammunition among trusted members. Guns and ammunition are not always kept together.

Hispanic gangs control their neighborhoods by controlling the drug trade. Drugs are the primary vehicle for gangs to make money and assert their influence. Gangs are involved in the drug trade at many different levels. For example, a gang may *permit* a non-gang member to sell drugs within the gang's territory.

Matlock's house is in territory claimed by VML. From 1990 to 2013, officers had documented defendant's contacts with VML 35 times. Based on defendant's gang tattoos and prior admissions to being an active VML member, the expert opined defendant was a VML member in good standing on April 30, 2013.

The expert opined that, hypothetically, if an active VML participant possesses five rounds of ammunition in a location within VML's claimed territory, the possession of the ammunition would be for the gang's benefit. The person possessing the ammunition would be a trusted and respected member to whom the gang would go when ammunition was needed. The expert opined that, hypothetically, if an active VML participant possesses quantities of methamphetamine for sale, it would be for the gang's

6

benefit, because drug sales earn money for the gang, establish the gang's control, and enhance its reputation and influence. Finally, the expert opined that, hypothetically, if an active gang member shares with a non-member a residence containing drugs for sale in the gang's territory, and the non-member is the one selling the drugs, the gang member's role and activity would be for the gang's benefit. The non-member would be authorized by that gang member to sell drugs and collect money in the gang's territory. A drug dealer who is not authorized by the gang can be taxed, meaning he can be assaulted or murdered.

## DISCUSSION

Defendant argues insufficient evidence showed he *knowingly* exercised a right to control the ammunition and the methamphetamine, as required to support a finding of constructive possession. He relies on this court's decision in *People v. Sifuentes* (2011) 195 Cal.App.4th 1410 (*Sifuentes*).

"Our review of this issue is limited to determining whether substantial evidence supports the verdict." (*Sifuentes*, *supra*, 195 Cal.App.4th at p. 1416.) We "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We "'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*Id.* at p. 576.) "'Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict" the conviction will not be reversed.'" (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1329.)

7

"The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"'" (*People v. Stanley* (1995)10 Cal.4th 764, 792-793.) We "must accept logical inferences the jury might have drawn from the circumstantial evidence." (*Sifuentes*, *supra*, 195 Cal.App.4th at p. 1416.) An appellant cannot succeed on an insufficiency of the evidence claim "by arguing about what evidence is *not* in the record . . . ." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

"The fact of possession may be established by circumstantial evidence and any reasonable inferences drawn therefrom." (*People v. Rice* (1976) 59 Cal.App.3d 998, 1003.) Possession of contraband may be actual (i.e., physical) or constructive. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.) Possession, whether actual or constructive, requires "that the accused had the right to exercise dominion and control over the contraband or at least that he had the right to exercise dominion and control over the place where it was found." (*Rice*, at p. 1002; see also *People v. Williams* (1971) 5 Cal.3d 211, 215 [contraband found on car seat where defendant had been sitting]; *Caughlin v. Superior Court* (1971) 4 Cal.3d 461, 465 [the defendant constructively possessed purse and its contents (i.e., marijuana), where purse was found sitting on floorboard of her car, she described car's location, and she was without purse at time of arrest for shoplifting]; *People v. White* (1969) 71 Cal.2d 80, 83 [marijuana found in defendant's shared bedroom in which he had been present within hours before search].)

"[E]xclusive possession or control is not necessary." (*People v. Rice*, *supra*, 59 Cal.App.3d at p. 1003.) "[M]ore than one person may possess the same contraband." (*People v. Miranda*, *supra*, 192 Cal.App.4th at p. 410.) The same holds true for the place where the contraband is found: "'Conviction is not precluded . . . if the defendant's right to exercise dominion and control over the place where the contraband was located is shared with another.'" (*Rice*, at pp. 1002-1003.)

"Constructive possession means the object is not in the defendant's physical possession, but the defendant *knowingly* exercises control or the right to control the object." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 831, italics added.) "Dominion and control" cannot be inferred from the defendant's mere proximity or access to the contraband. (*People v. Zyduck* (1969) 270 Cal.App.2d 334, 336.) "Something more must be shown." (*Ibid.*) Nonetheless, "the necessary additional circumstances may, in some fact contexts, be rather slight." (*Ibid.*)

Defendant argues his case falls squarely within this court's holding in *Sifuentes*, *supra*, 195 Cal.App.4th 1410. There, we reversed Sifuentes's conviction for possession of a gun by a felon, after determining the evidence did "not support the conclusion Sifuentes had the right to control the firearm discovered near Lopez," his codefendant. (*Id.* at p. 1413.)

In *Sifuentes*, officers entered a room in a motel known for drug and prostitution activities, and saw the following scene. (*Sifuentes*, *supra*, 195 Cal.App.4th at pp. 1413-1414.) Sifuentes, a convicted felon, "lay on top of the bed nearest the door." (*Id.* at p. 1414.) "Lopez, also a convicted felon, knelt on the floor on the far side of the second bed, facing the officers. There were two women in the room. One lay naked under the sheets of the bed closest to Lopez. The other stood near the bathroom, wrapped in a towel." (*Ibid.*)

"An officer later found a loaded .40-caliber semiautomatic handgun under the mattress next to Lopez. . . . Officers also found methamphetamine and a pipe in

9

Sifuentes's pocket." (*Sifuentes*, *supra*, 195 Cal.App.4th at p. 1414.) At trial a gang expert testified Sifuentes and Lopez were active participants in the same gang on the day of their arrest. (*Ibid.*) The motel in question was *not* located in the territory claimed by their gang. (*Id.* at p. 1416.)

Upon Sifuentes's appeal from his firearm possession conviction, we observed that no evidence showed the weapon found under the mattress was a gang gun that had been used either offensively by a gang to commit crimes and assault rivals or defensively against rival gangs. (*Sifuentes*, *supra*, 195 Cal.App.4th at p. 1417.) The gang expert had testified a gang gun was "'accessible' to gang members 'at most times'" (*id*. at p. 1417), but also that unspecified restrictions existed on whether any particular gang member could use a gang gun (*id.* at pp. 1417-1418), thereby leaving open to question whether Sifuentes had any right to control the gun. Given that Sifuentes and Lopez had "simply occupied a motel room with two females," no evidence showed the men "had used or were about to use the gun offensively or defensively." (*Id.* at p. 1418.) Furthermore, even assuming the firearm was a gang gun, "no evidence showed Sifuentes had the right to control the weapon." (*Id.* at p. 1417.) The expert did *not* "link Sifuentes to the particular firearm found next to Lopez." (*Id.* at p. 1419.) "Even assuming the expert implied Sifuentes could exercise control over the firearm, no evidentiary basis existed to support this conclusion." (*Ibid.*)

Here, in contrast, the location was *not* a motel room in which two naked women were present and which lay outside the gang's turf and in an area known for prostitution. Instead, the location was a house in VML's claimed territory protected by a high fence with a locked gate and guarded by two surveillance cameras. Defendant — a member of VML, which controlled the drug trade in the area — lived in the house for significant time periods between January and April of 2013, including the two weeks leading up to the police raid. While there, defendant spent *all* his time in the middle bedroom (where two surveillance monitors, a safe, and nine grams of methamphetamine

10

worth up to $1,600, were found) and the shed (where five rounds of luger ammunition were uncovered). Defendant took photos and videos of himself in the middle bedroom and the shed. Tinder also spent time in the middle bedroom and the shed. The twosome spent hours together in both places. Matlock's children did not spend any time in the shed.

Beyond defendant's proximity and access to the contraband and the places where it was kept, "something more" (*People v. Zyduck*, *supra*, 270 Cal.App.2d at p. 336) showed he constructively possessed the ammunition and the methamphetamine. Defendant, a VML member in good standing, kept some of his belongings in the shed (including his clothes), as well as a document belonging to a fellow VML member. The burgundy bag found in the shed contained male clothes and ammunition. Unlike defendant, Tinder kept his clothes in the middle bedroom, *not* in the shed. Matlock did not believe Tinder possessed a gun nor had Ryan ever seen Tinder with a gun. Defendant, Tinder, and "neighbors" were *always* working on building the shed, which had been totally rebuilt. Tinder admitted to Ryan that he had been selling drugs in the house. A non-member selling drugs in a gang's territory risks being severely punished unless the gang authorizes his sales and collection of money. The month before the raid, an officer found baggies (of a small size commonly used as drug bindles) on defendant's person. Defendant and Tinder slept on the floor of the middle bedroom, whose door was locked at night. When the police raided the house, defendant was the last to emerge and he came out of the middle bedroom. His cell phone contained a photo of the live surveillance feed in the middle bedroom.

Taken together, these circumstances suggest a collaboration between defendant and Tinder to sell drugs in VML territory with precautions taken to fortify the house, including the presence of ammunition in the shed. As stressed above, possession of contraband, or the location where it is kept, can be joint. Constructive possession can be inferred from dominion and control over either the contraband or the place where it

11

was found.  And, a finding of constructive possession can be based wholly on circumstantial evidence.

Here, the totality of circumstances (*Armstrong v. Superior Court* (1990) 217 Cal.App.3d 535, 539) reasonably supports the jury's findings.

## DISPOSITION

The judgment is affirmed.

IKOLA, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

THOMPSON, J.